UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - -   x
UNITED STATES OF AMERICA          :
                                  :
     - v -                        :
                                  :        **15 Cr. 588 (ER)**
**AHMED MOHAMMED EL GAMMAL,**     :
          Defendant.              :
- - - - - - - - - - - - - - - -   x



**MEMORANDUM OF LAW IN SUPPORT OF
DEFENDANT'S PRETRIAL MOTION TO SUPPRESS, AND FOR DISCLOSURE OF
FISA ORDER, APPLICATION, AND RELATED MATERIALS**



                    Federal Defenders of New York
                    Daniel Habib, Esq.
                    Annalisa Miron, Esq.
                    Sabrina Shroff, Esq.
                    Attorneys for Defendant
                       **Ahmed Mohammed El Gammal**
                    52 Duane Street - 10th Floor
                    New York, NY 10007
                    Tel.: (212) 417-8769



TO:     PREET BHARARA, ESQ.
        United States Attorney
        Southern District of New York
        1 St. Andrew's Plaza
        New York, NY 10007
Attn:   **Brendan Quigley, Esq. and Negar Tekeei, Esq.**
        Assistant United States Attorneys

## PRELIMINARY STATEMENT

Ahmed Mohammed El Gammal is charged in a four-count indictment with providing and attempting to provide material support to a foreign terrorist organization, in violation of 18 U.S.C. §§ 2339B and 2 (Count 1); conspiring to do the same, § 2339B (Count 2); aiding and abetting the receipt of military-type training from a foreign terrorist organization, §§ 2339D and 2 (Count 3); and conspiring to receive such training, § 371 (Count 4).   Dkt. No. 3 (Indictment).   Briefly, the government alleges that El Gammal helped an unindicted co-conspirator, ██ ████████, travel from the U.S., through Turkey, to Syria, where ████████ joined the Islamic State in Iraq and the Levant ("ISIL").   Specifically, the government says, El Gammal introduced ████████ via Facebook to another unindicted co-conspirator, ████████████, who lived in Turkey; and communicated with ████████ via Facebook while the latter was traveling through Turkey.   Dkt. No. 1 (Complaint) ¶¶ 12-16.

El Gammal was arrested and indicted in August 2015.   On July 13, 2016 -- almost a year later, and about two months before trial was to begin -- the government provided notice, pursuant to 50 U.S.C. § 1825(d), of its intent to introduce at trial "information obtained and derived from physical searches conducted pursuant to the Foreign Intelligence Surveillance Act of 1978 ("FISA"), as amended 50 U.S.C. §§ 1821-29."   Dkt.

1

51. ███████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████

████████████████████████   ███████████████

███████████████████████████████████████████

███████████████████████████████████████████

██████████████████████████████████

████████████████████[1]

El Gammal now moves: (1) to suppress the evidence obtained pursuant to FISA, see 50 U.S.C. § 1825(f); or (2) in the alternative, to compel disclosure of the government's FISA application, the FISA Court's order, and related materials (at a minimum, the Attorney General's certifications and the government's minimization procedures), see id. § 1825(g) and (h); U.S. Const. amends. IV, V, VI.

## BACKGROUND

As discussed in El Gammal's separate memorandum in support of his motion to compel notice and discovery of searches, seizures, and surveillance techniques, for more than a year, the

---

[1] El Gammal does not concede that the evidence is admissible for this purpose and reserves the right to move in limine for its exclusion under Fed. R. Evid. 401 and 403, among other grounds.

government has conducted a searching investigation into his

personal and professional lives. ████████████████████████

████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

████████████████████████████████████████████████████

      ■ ████████████████████████████████████

      ■ ████████████████████████████████████

      ■ ██████████████████████████████████████

      ■ █████████████████████████████████████

██████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████

    While the government was using these ordinary techniques

(to great effect), it was also pursuing a separate covert

investigation under the authority of FISA.  El Gammal knows next

to nothing about this investigation.  The government has

disclosed only that it intends to introduce into evidence at

trial the fruits of a single FISA search, but even that

disclosure raises as many questions as it answers. ████

████████████████████████████████ ████████████████████████

███████████████████████████████████████

██████████████████████████████████████████████████████████

████████████████████████████████████████████████

██████████████████████████████████████████████████████████



4

The government has not disclosed its application for a FISA order, the order itself, ██████████████████████████████████  More broadly, the government has not explained when the FISA investigation began, who (in addition to El Gammal) its targets were, what premises or properties were seized, what communications were intercepted, for what purposes, and subject to what minimization procedures.

## ARGUMENT

### I.   This Court Should Suppress The FISA-Obtained Evidence.

#### A.   Legal Framework

FISA permits the Chief Justice of the United States to designate eleven federal judges as the Foreign Intelligence Surveillance Court ("FISA Court"), see 50 U.S.C. § 1803(a)(1), with jurisdiction to entertain ex parte executive applications for leave to conduct several different types of surveillance. See United States v. Abu-Jihaad, 630 F.3d 102, 117-18 (2d Cir. 2010).  Subchapter II of FISA, 50 U.S.C. §§ 1821-29, governs physical searches of the type at issue here.  A judge of the FISA Court may authorize "a physical search in the United States of the premises, property, information, or material of a foreign power or an agent of a foreign power for the purpose of collecting foreign intelligence information."  § 1822(b).

Sections 1823 and 1824 specify substantive and procedural prerequisites to the issuance of a FISA warrant for a physical search.  As relevant here, and as discussed in more detail below, the government must demonstrate probable cause to believe that the target of the search is the "agent of a foreign power," and that the property to be searched contains "foreign intelligence information" and is "owned, used, or possessed by ... an agent of a foreign power," §§ 1823(a)(3)(A)-(C), 1824(a)(2); and that the "acquisition and retention" of "nonpublicly available information concerning unconsenting United States persons" will be minimized, §§ 1821(4), 1823(a)(4), and 1824(a)(3).  In addition, the Attorney General must certify that "a significant purpose of the search is to obtain foreign intelligence information," and that "such information cannot reasonably be obtained by normal investigative techniques."  § 1823(a)(6)(B)-(C).

FISA confers on any "aggrieved person" -- i.e., "any ... person whose premises, property, information, or material was subject to a physical search," § 1821(2) -- standing to contest the lawfulness of a FISA order by moving to suppress.  See § 1825(f).  "[T]he established standard of judicial review of FISA warrants is deferential," and "FISA warrant applications are subject to 'minimal scrutiny by the courts,' both upon initial presentation and subsequent challenge."  Abu-Jihaad, 630

F.3d at 130 (quoting United States v. Duggan, 743 F.2d 59, 77
(2d Cir. 1984)).  But "even minimal scrutiny is not toothless."
Id.  This Court has an independent obligation to ensure that
probable cause supports the government's foreign-power showings,
and that the Attorney General has properly certified the
application, Duggan, 743 F.2d at 77.

B.   Based On The Information Known To The Defense, The FISA
Search Was Unlawful.

El Gammal's lack of information concerning the FISA
application and order limits his ability to challenge the
lawfulness of the search.  Nonetheless, he can identify several
statutory and constitutional prerequisites that the government
may have failed to satisfy.

1.   Agent Of A Foreign Power.

To authorize a search, the FISA Court must find probable
cause to believe that "the target of the physical search is a
foreign power or an agent of a foreign power."  § 1824(a)(2)(A).
El Gammal is plainly not a "foreign power."  See §§ 1801(a)
(defining "foreign power" to include foreign governments,
factions of nations, groups, organizations, or entities
controlled by foreign governments, or groups engaged in
international terrorism), 1821(1) (incorporating this definition
in subchapter II).  Nor is he an "agent of a foreign power."
The defense does not believe that the government could have

shown, at the time of its FISA application, that El Gammal
"knowingly engage[d] in sabotage or international terrorism, or
activities that are in preparation therefor, for or on behalf of
a foreign power," or that he aided and abetted or conspired with
anyone to do so, §§ 1801(b)(2)(C) and (E), 1821(1).  In
particular, the defense does not believe that the government
could have shown the necessary "agency" relationship between
himself (or ███████████ or ████████, with whom he is alleged to
have conspired) and a particular "foreign power."  See Merriam-
Webster's Collegiate Dictionary 110 (11th ed. 2014) (defining
"on behalf of" to mean "as a representative of").  Nor can the
government have shown that El Gammal "knowingly" engaged in
terrorism or activities preparatory to terrorism (or had the
specific intent necessary to aid and abet, or conspire to
commit, those offenses), as opposed to having assisted ██
███████ to travel without knowing his specific objective.

      Moreover, "no United States person" -- a term that includes
naturalized U.S. citizens such as El Gammal, § 1801(i) -- "may
be considered an agent of a foreign power solely upon the basis
of activities protected by the first amendment to the
Constitution."  § 1824(a)(2)(A).  Accordingly, El Gammal's
expressive activities -- ████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████

████████████████████████████ -- cannot establish
probable cause for a FISA order.  ████████████ were core First
Amendment-protected content -- political speech on a matter of
public concern -- no matter how distasteful the government or
even the general public may find it.  See, e.g., Snyder v.
Phelps, 562 U.S. 443, 458 (2011).  Indeed, the First Amendment
includes the freedom to advocate the use of force or the
violation of the law, or even to advocate unlawful action at
some indefinite time in the future.  See Brandenburg v. Ohio,
395 U.S. 444, 447-49 (1969); Hess v. Indiana, 414 U.S. 105, 108-
09 (1973).  See also Holder v. Humanitarian Law Project, 130 S.
Ct. 2705, 2710 (2010) (for First Amendment reasons, "material
support" does not include independent advocacy or membership in
a proscribed organization).

████████████████████████████████

███████████████████████████████████

███████  █████████████████████████████████

███████████████████████████████

███████████████████████████████████

████████████████████████████████

██████████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████

████████████████████████████████████   ██

████████████████████████████████

2.  "Significant Purpose" To Obtain Foreign Intelligence.

FISA requires that "a significant purpose of the search is

to obtain foreign intelligence information," defined as

"information that relates to, and if concerning a United States

person is necessary to, the ability of the United States to

protect itself against ... actual or potential attack or other

grave hostile acts of a foreign power or an agent of a foreign

power," or "international terrorism ... by a foreign power or

agent of a foreign power."  §§ 1801(e)(1)(A) and (B),

1823(a)(6)(B).  The "significant purpose" test "impose[s] a

requirement that the government have a measurable foreign

intelligence purpose, other than just criminal prosecution of

even foreign intelligence crimes" in seeking to obtain a FISA

order.  In re Sealed Case, 310 F.3d 717, 735 (FISA Ct. Rev.

2002).  "Indeed, the FISA Review Court has ruled that the

significant purpose requirement specifically 'excludes from the

purpose of gaining foreign intelligence information a sole

objective of criminal prosecution,' even for foreign

intelligence crimes."  Abu-Jihaad, 630 F.3d at 128 (quoting In

re Sealed Case, 310 F.3d at 735).  Thus, if the purpose of ████

████████████████████████████████  was to gather

evidence of his past criminal activity, the search was unlawful.

10

3.   Intentional or Reckless Material Falsehoods Or Omissions.

The Fourth Amendment limits the use of evidence derived from a warrant tainted by misinformation.  "To suppress evidence obtained pursuant to an affidavit containing erroneous information, the defendant must show that: (1) the claimed inaccuracies or omissions are the result of the affiant's deliberate falsehood or reckless disregard for the truth; and (2) the alleged falsehoods or omissions were necessary to the judge's probable cause finding."  United States v. Rajaratnam, 719 F.3d 139, 146 (2d Cir. 2013); see also Franks v. Delaware, 438 U.S. 154, 156 (1978).  The Franks rule applies to false statements as well as omissions.  With respect to the latter, the analytical approach is "to insert the omitted truths revealed at the suppression hearing," and ask whether the corrected affidavit establishes probable cause.  Rajaratnam, 719 F.3d at 146.

The possibility that the government has submitted FISA applications with intentionally or recklessly false statements or material omissions is not speculative.  For instance, in In re All Matters Submitted to the Foreign Intelligence Surveillance Court, 218 F. Supp. 2d 611, 620-21 (FISC 2002), rev'd on other grounds sub nom. In re Sealed Case, 310 F.3d 717 (FISA Ct. Rev. 2002), the FISC reported that beginning in March 2000, the Department of Justice had come "forward to confess

11

error in some 75 FISA applications related to major terrorist

attacks directed against the United States.   The errors related

to misstatements and omissions of material facts," including:

- "75 FISA applications related to major terrorist attacks directed against the United States" contained "misstatements and omissions of material facts," 218 F. Supp. 2d at 620-21;
- the government's failure to apprise the FISC of the existence and/or status of criminal investigations of the target(s) of FISA surveillance, id.; and
- improper contacts between criminal and intelligence investigators with respect to certain FISA applications, id.

According to the FISC, "[i]n March of 2001, the government

reported similar misstatements in another series of FISA

applications."   Id. at 621.   Nor were those problems isolated or

resolved by those revelations.   Instead, they proved persistent.

A report issued March 8, 2006, by the DOJ Inspector General

stated that the FBI found apparent violations of its own

wiretapping and other intelligence-gathering procedures more

than 100 times in the preceding two years, and problems appear

to have grown more frequent in some crucial respects.   See

Report to Congress on Implementation of Section 1001 of the USA

PATRIOT Act, March 8, 2006, available at

http://www.usdoj.gov/oig/special/s0603/final.pdf.   The report

characterized some violations as "significant," including

wiretaps that were much broader in scope than authorized by a

court ("over-collection"), and others that continued for weeks

12

and months longer than authorized ("overruns").  Id. at 24-25.
FISA-related over-collection violations constituted 69% of the
reported violations in 2005, an increase from 48% in 2004.  See
id. at 29.  The total percentage of FISA-related violations rose
from 71% to 78% from 2004 to 2005, id., although the amount of
time "over-collection" and "overruns" were permitted to continue
before the violations were recognized or corrected decreased
from 2004 to 2005.  Id. at 25.  A Franks hearing may be
appropriate in order to allow the defense the opportunity to
prove that the affiants before the FISA Court intentionally or
recklessly made materially false statements and omitted material
information from the FISA applications.



13



### 4.   Attorney General's Certifications.

This Court must review the FISA applications to determine whether they contain the certifications required by § 1823(a)(6).  The Court should examine one certification with particular care: "that such information cannot reasonably be obtained by normal investigative techniques."  § 1823(a)(6)(C). Because the government could and did use traditional investigative techniques in this case, it is likely that there was no need for such intrusive measures.  ████████████

████████████████████████████████████████████████████

████████████████  ██████████████████████████████████

████████████████████████████████████

### 5.   Minimization Procedures

Under FISA, the government is required to demonstrate that it has minimized its intrusions.  <u>See, e.g.</u>, §§ 1821(4), 1823(a)(4), 1824(a)(3) and (c)(2)(A), 1825(a).  "[The] minimization procedures are designed to protect, as far as

reasonable, against the acquisition, retention, and dissemination of nonpublic information which is not foreign intelligence information.  If the data is not foreign intelligence information as defined by the statute, the procedures are to ensure that the government does not use the information to identify the target or third party, unless such identification is necessary to properly understand or assess the foreign intelligence information that is collected."  In re Sealed Case, 310 F.3d at 731.

The statute requires three specific types of minimization to protect distinct interests.  § 1821(4).  First, by minimizing acquisition, Congress envisioned that surveillance should be discontinued where the target is not a party to the communications.  Second, by minimizing retention, Congress intended that information acquired, which is not necessary for obtaining, producing, or disseminating foreign intelligence information, be destroyed where feasible.  Third, by minimizing dissemination, Congress intended that even lawfully retained information should only be divulged to those officials with a specific need.  "The FISA minimization procedures were enacted 'generally to parallel the minimization provision in existing [electronic surveillance] law.'"  United States v. Thomson, 752 F. Supp. 75, 80 (W.D.N.Y. 1990) (quoting S. Rep. No. 95-701, at 39 (1978), reprinted in 1990 U.S.C.C.A.N. 4008).

Here, the government obtained, at a minimum, ███████████

████████████████████████████████████████████████

-- and because the government has not produced all of the FISA return, obtained perhaps much more.  It is therefore possible that the FISA order did not contain adequate minimization procedures, or that those procedures weren't followed.

**II.   In The Alternative, This Court Should Order Disclosure Of The FISA Application, Order, And Related Materials**

A.   Legal Framework

In determining whether a FISA search "was lawfully authorized and conducted," this Court "may disclose to the aggrieved person, under appropriate security procedures and protective orders, portions of the application, order, or other materials relating to the physical search, ... only where such disclosure is necessary to make an accurate determination of the legality of the physical search."  § 1825(g).  If this Court "determines that the physical search was lawfully authorized and conducted, it shall deny the motion of the aggrieved person except to the extent that due process requires discovery or disclosure."  § 1825(h).  True, "disclosure is the exception and 'ex parte, in camera determination is the rule.'"  United States v. Stewart, 590 F.3d 93, 129 (2d Cir. 2009) (quoting Duggan, 743 F.2d at 78).  But "[t]he need to disclose materials to defense counsel may arise if the judge determines there to be 'potential

irregularities such as possible misrepresentation of fact, vague identification of the persons to be surveilled or surveillance records which include a significant amount of nonforeign intelligence information, calling into question compliance with the minimization standards contained in the order.'"  Id. (quoting Duggan, 743 F.2d at 78).

B.   FISA And The Constitution Require Disclosure.

In a case such as this, where there are many potential grounds for suppression and extensive discovery materials with which the Court is unfamiliar, it is impossible to "make an accurate determination of the legality of the physical search," § 1826(g), without the informed participation of defense counsel.  As such, El Gammal has satisfied the statutory standard for disclosure.  Counsel for El Gammal (Sabrina Shroff) possesses security clearance and has reviewed Classified Information Procedures Act ("CIPA") materials produced in this case.  This Court can order disclosure to Ms. Shroff (and not to El Gammal) pursuant to a protective order.

Independently, the defense has a constitutional entitlement to disclosure of the FISA materials under the Fourth, Fifth, and Sixth Amendments.  As to Fifth Amendment due process and Sixth Amendment fair trial rights, ex parte proceedings impair the integrity of the adversary process and the criminal justice system.  As the Supreme Court has recognized, "'[f]airness can

17

rarely be obtained by secret, one-sided determination of facts decisive of rights. ... No better instrument has been devised for arriving at truth than to give a person in jeopardy of serious loss notice of the case against him and opportunity to meet it.'" United States v. James Daniel Good Real Property, 510 U.S. 43, 55 (1993) (quoting Joint Anti-Fascist Refugee Committee v. McGrath, 341 U.S. 123, 170-72 (1951) (Frankfurter, J., concurring)). See also United States v. Madori, 419 F.3d 159, 171 (2d Cir. 2005) (closed proceedings "are fraught with the potential of abuse and, absent compelling necessity, must be avoided"). "Particularly where liberty is at stake, due process demands that the individual and the government each be afforded the opportunity not only to advance their respective positions but to correct or contradict arguments or evidence offered by the other." United States v. Abuhamra, 389 F.3d 309, 322-23 (2d Cir. 2004).

As to Fourth Amendment concerns, El Gammal is entitled to litigate the lawfulness of searches that produce evidence introduced to prove his guilt. In the Fourth Amendment context, including in relationship to electronic surveillance, the Supreme Court has rejected the use of ex parte proceedings on grounds that apply equally here. In Alderman v. United States, 394 U.S. 165 (1969), the Court addressed the procedures to be followed in determining whether government eavesdropping in

18

violation of the Fourth Amendment contributed to the
government's case against the defendants.  The Court rejected
the government's suggestion that the district court make that
determination in camera and/or ex parte.  In ordering disclosure
of improperly recorded conversations, the Court explained:
"[a]dversary proceedings will not magically eliminate all error,
but they will substantially reduce its incidence by guarding
against the possibility that the trial judge, through lack of
time or unfamiliarity with the information contained in and
suggested by the materials, will be unable to provide the
scrutiny that the Fourth Amendment exclusionary rule demands."
394 U.S. at 184.

The same considerations recommend against ex parte
procedures in the FISA context.  Indeed, the lack of any
authentic adversary proceedings in FISA litigation more than
likely accounts for the government's successful record in
defending FISA and FISA-generated evidence.  After all, denying
an adversary access to the facts constitutes an advantage as
powerful and insurmountable as exists in litigation.  As the
FISA Court itself has acknowledged, for example, without
adversarial proceedings, systematic executive branch misconduct
-- including submission of FISA applications with "erroneous
statements" and "omissions of material facts" -- went entirely
undetected by the courts until the Court directed that the

19

Department of Justice review FISA applications and submit a
report to the FISC.  See In re All Matters Submitted to the
Foreign Intelligence Surveillance Court, 218 F. Supp.2d at 620-
21.  This Court's review in camera is not a substitute for
defense counsel's participation.  As the Supreme Court
recognized in Alderman, "[i]n our adversary system, it is enough
for judges to judge.  The determination of what may be useful to
the defense can properly and effectively be made only by an
advocate."  394 U.S. at 184; see also Franks, 438 U.S. at 169
(permitting adversarial proceeding on showing of intentional
falsehood in warrant affidavit because the magistrate who
approves a warrant ex parte "has no acquaintance with the
information that may contradict the good faith and reasonable
basis of the affiant's allegations").

**CONCLUSION**

For the reasons stated, this Court should grant El Gammal's motion to suppress, or, in the alternative, order disclosure of the FISA order, application, certifications, and minimization procedures.

Dated:      New York, New York
            August 12, 2016

                              Respectfully submitted,
                              Federal Defenders of New York

                              /s/ Daniel Habib, Esq.
                              Daniel Habib, Esq.
                              Annalisa Miron, Esq.
                              Sabrina Shroff, Esq.
                              Attorneys for Defendant
                                **Ahmed Mohammed El Gammal**
                              52 Duane Street - 10th Floor
                              New York, NY 10007
                              Tel.: (212) 417-8769